May it please the court. Heather Scott on behalf of Appellant Rolando Trujillo, Jr. Today, we're asking the court to reverse the district court's denial of qualified immunity as to Officer Trujillo. Reversal of the district court's denial of qualified immunity is appropriate for several reasons. In this case, the district court held and the appellees assert that Officer Trujillo's claim for qualified immunity depends upon whether he was threatened by Mr. Rodriguez, but that is not the correct legal inquiry. The correct inquiry is whether Officer Trujillo reasonably perceived a threat by Mr. Rodriguez. Two distinct inquiries, and if you choose the former, that is contrary to what the case law regarding qualified immunity holds. Supreme Court jurisprudence expressly mandates that the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the benefit of 20-20 hindsight, and the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments. A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of or others. In evaluating whether an officer acted reasonably, courts may consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of others or the officer, and whether he is actively resisting arrest or attempting to evade arrest by flight. The court must consider all of the circumstances leading up to the moment deadly force is used because they inform the reasonableness of the officer's decision-making. You're not contending that the plaintiff's version of the facts is precluded by the video, are you? Under Scott v. Harris. That's you're not arguing that. I am not arguing that, Your Honor. I'm arguing that the Scott v. Harris on that issue as far as the video is accurate, and I'm not contesting that. Okay, so the video is too murky to tell what happened. The video is too... The Fourth Amendment does not require omniscience. Officers need not be absolutely sure of the nature of the threat of the suspect's intent to cause the harm. The Constitution does not require certitude to proceed the act of self-defense or self-protection. The case law instructs us when that a law enforcement officer reasonably believes, even if he's mistaken, that an individual poses a serious threat to the officer is justified in using greater force than in fact we maybe later found was needed because reasonable mistakes can be made as to the legal constraints on police conduct in such circumstances. Now, we're really familiar with the case law in this area because we see this so frequently. Correct. Can you address... Is it your position that even if the officer was wrong, and he wasn't grabbing a metal object, but he was shifting gears, that it was still not unreasonable for him to get that wrong in the dark? Is that your position? What is your position? Correct, Your Honor. I mean, even if taking Appley's contention of what Mr. Rodriguez may have been doing inside the vehicle, their contention is that he was possibly shifting gears, okay? Even taking that, Mr. Officer Trujillo still had reasonable belief to fear for his safety. As you can see in the video, he approached the vehicle, opened the vehicle's door where the suspect driver, and I'm not even getting into what preceded that, into taking everything as a totality of what had happened that evening. But just that one instance, you know, you have the suspect driver's closing the door, Officer Trujillo losing sight of the suspect's hands in the middle area, not knowing where his hands are. It's, this court has even addressed cases, and most recently in, I believe it's Romero versus City of Grapevine, where even if the officer loses sight at least once of the suspect's hands, that's still, it's reasonable for that officer to fear for his safety, to think that that suspect may be reaching for a weapon. So, is it, then it doesn't matter whether he's actually going for a weapon? It doesn't matter because he can't tell what he's doing, and that he can shoot him if he can't tell? Is that your position? I'm just trying to get it straight. I understand, Your Honor. My position is that whether or not it was reasonable for Officer Trujillo to fear for his safety, and yes, he perceived that that threat of an object coming at him. And I'm saying the case law that this court has already addressed says that it's enough that the officer sees that there's losing sight of the suspect's arm, and that the perception that he's grabbing for a weapon. This court has already addressed that several times. In Romero, is the case you would cite us to for that? What other cases would you cite us to? You said several times. Yes, Your Honor. In our brief, I cited to Ontiveros versus City of Rosenberg, Reese versus Anderson, and I followed up with a letter brief on, it was just submitting the case, Romero versus City of Grapevine, which was decided, I believe, after we submitted our briefing. I addressed several other cases in the brief that... But you think that these are most similar regarding not being able to see what the gentleman is doing in the car? Yes, Your Honor. What about the fact that the shot continued after the carbs hit the gas? I mean, it's pretty quick, but nonetheless, it seems that one shot or so might come after the gas. Maybe more, but does that matter? Your Honor, I believe the court in Little versus Bexar County, which ironically, the district court used that case, Little versus Bexar County, as authority to hold that Officer Trujillo's actions were unconstitutional. I believe they stated that it's been long clearly established that absent another justification for the use of force, it's unreasonable for a police officer to use deadly force against a fleeing felon. That's kind of black letter law, isn't it? Correct. The district court uses that case, but going into Little, it even states in Little that if the officer fired immediately after the suspect vehicle had moved, the officer's actions would still be constitutional. So even in Little, which I feel is distinguishable and it doesn't even get to where we're at in this case, even that case addressed that if the officer fires his weapon immediately, that's still within the constitutional bounds. Okay, so it's all in one fell swoop. But if he was running down the feeder road shooting his gun, that would not be protected. Is that your position? That's my position. In fact, Appleby's cite to a case where that was in fact what happened. The  I'm sorry for that, but it's Little because that's exactly what happened. The contention was that the suspect vehicle I think was about three or four houses away from the police officer at the time that the officer was shooting, which is clearly distinguishable than what happened here. I mean, that's clearly shown on the video. As grainy as it may be, you can see though the vehicle wasn't so far away as to where the threat had stopped. This is a misdemeanor, right? Correct. This was a class B misdemeanor for what he was being pursued. Beer. Stealing beer from a convenience store. One of the suspects. $24 worth of merchandise. It's a misdemeanor and so the arrest, the man is dead. He was shot, killed right there on the road. Because it was dark, I take it. Are you sure? I mean, this is... Your Honor, if I... If you shoot a misdemeanor suspect, what is your bottom line? He was entitled to shoot this man who stole the three, six packs of beer because... What's the bottom line? Because of his actions and not complying with the officer and the officer losing sight of... We have cases that say that you can't shoot a fleeing person who's committed a misdemeanor. I understand that, Your Honor, but... Why? Why could this police officer shoot this man? At this point, you know, taking the totality of what was what the officer was facing at that time, and if I may go back, yes, it was late at night. It was the early morning hours, I believe. The description of the suspect vehicle and the suspects as well fit the same description of a bolo that had just gone out to the officers of suspects that were involved in aggravated robberies where gun was brandished and I believe a knife was, and those are the printouts of the bolos are attached and in the record. So these things were going through the officer's mind at the time. These are possibly these suspects that were involved in these other recent robberies that weren't... had guns involved and had weapons involved. The officer had the unknown of whether or not there was the weapon inside the vehicle. You had the passenger suspect that fled on foot into a vacant open field. So, taking into account all of that information, it wasn't just simply taking and looking at it. Okay, I have a beer run and you know, this is what it is. It's the totality of the circumstances of what that officer knew at the time. Albeit later, whether or not it may have been mistaken. The case law is clear though that the officer can be mistaken. So to answer your question, Your Honor, I believe it's not just looking at it from that aspect of they stole a few cases of beer. This is... That case is... 3, 6 packs. I think it was 6 or 18 packs. I'm not sure. But yes, I mean it was a misdemeanor. You're correct, Your Honor. I'm not gonna... I'm not disputing that. But definitely, I do want to bring it to the court's attention that there were several other factors going into this traffic stop. So we can just shoot all brownish or goldish older model SUVs? Because that was the Bolo. It wasn't any more specific than that. Could describe a lot of cars out on the road. I believe it had the description. I think it had two individual suspects. I mean, it didn't have their names or anything. And that's, of course, the officer did not know who the suspects he was pursuing. But he did know that the vehicle matched the description and they were two just like... But in answer to Judge Haines' question, you're not saying that they can shoot everybody? No, of course not, Your Honor. When is it appropriate that the shooting can take place? And I think that's why each case in these types of cases are taken on a fact-by-fact basis. What were the facts that said shooting was okay here or not? Maybe not okay, but not a violation of clearly established law. What are the specific facts that make this case different than just willy-nilly shooting someone fleeing? Okay, Your Honor. This incident occurred in the late evening, early hour morning. So you have... So if you commit a misdemeanor, you steal three six-packs of beer at night, you're dead. No, and I'm not saying that... What's next? What's next? We have the officer with the information of the suspect vehicle, the description of the suspect vehicle. He was not... Well, it doesn't matter about the vehicle. I mean, if these people were on foot, you couldn't shoot them. No, and I'm not... We're not... Why is the vehicle relevant? The vehicle is relevant because it goes into that the mindset of the officer had at that time. He had the information of a similar described vehicle that was involved in two aggravated robberies where weapons were used. So that's why the vehicle description is relevant to what was in the officer's mindset at the time. He did not have the knowledge of whether those specific suspects he was pursuing had any weapons or not. When he made... But he knew that there was no violent crime that he was investigating at that point. In other words, that the theft of the beer didn't come with waving any guns or making any threats. It was... Your Honor, I would venture to say he did not know that because that question was not asked of the store clerk. And I cite in the briefing to the record where that is the store clerk testified to that, that that was question was never asked. It was a brief encounter. What direction was the vehicle going? Takes off to pursue the vehicle. I thought it was that your position and maybe correct me if I'm wrong, but I thought your position was that once they slammed the door and he couldn't see his hands, that's when it became okay to shoot. Because he quickly shut the door and then all of a sudden he can't see him. And he doesn't know whether he... And he's right there in the car and the officer is. And so he doesn't know whether he's about to be shot. That's... I thought that was why it was okay from your perspective. Yes, Your Honor. And it doesn't matter so much about the bolo and all that. It's because of the instant action. It's the colors, the surrounding circumstances in the dark there on the side of the road. Yes, Your Honor. All of that information plays into it, but you're correct. And that is my position. Yes, Your Honor. Yes, Your Honor. So if he hadn't slammed the door and he couldn't see him there for a second, then he wouldn't be allowed to shoot him. Had he had a visual of what his hands were doing and had the individual... If he was compliant, it would change the whole dynamic of what happened at that instant. So then it's a case of self-defense on the part of the officer. Correct, Your Honor. I mean, he had the reasonable belief... And I'm out of time, but if I may... You may answer Judge King's question. At that point, it becomes, you know, he's fearing for his safety for the fear that the suspect has... And it's dark. It's in the middle of the night. And he can't see what's happening to the hands, then what? Well, obviously, it depends on the factual circumstances. I don't think that there's a blanket generality that should be espoused as to that contention, Your Honor. But I believe there's several cases that have held that once the officer loses sight of the suspect's hands, it's reasonable for him to believe, to fear for his safety. And that belief is what would determine his decision to shoot. Okay, so that's what we need. The message we need to get out is that if you get stopped in the middle of the night and the officer can't see your hands, you may be shot. That's the message? I don't believe it's a message, Your Honor. I think the case... So your message is you get stopped in the middle of the night, that can happen. Happened to me. I didn't actually get stopped, but I was approached by the police. So if you get stopped in the middle of the night and the officer can't see your hands, then you can be shot. I wouldn't make a blanket rule like that, Your Honor. I think each case is determined on the facts of each, you know, it's fact specific. So what was the fact here in addition to that? It certainly wasn't a misdemeanor offense. You can't shoot a misdemeanor offense person. As I stated earlier, Your Honor, as this court has held before, the fact that the suspect was not complying, the officer lost visual of the suspect's hand and feared that he was grabbing for a weapon. Was that because he slammed the door all of a sudden? Yes. I mean, it's clear in the video that that's what he did. That obviously gives him, it prevents him from having a full visual of the suspect driver. That's the bottom line. Don't have a full visual. There you go. That's it. I would just reiterate that each case is fact specific, Your Honor. Thank you, Counsel. I think we've saved time for rebuttal and we'll hear from the other side now. I mean, does that sum it up? It's so fact specific that we lack jurisdiction over this appeal? I believe that's exactly the right analysis of this case, Your Honor. I think this is paradigmatically the sort of case in which this court has refused to find jurisdiction. And I would juxtapose it with the en banc court's determination in Melton, which isn't cited in our brief, but perhaps should have been. Did you provide that to the other side before you showed up today to argue and mention it? I'm very familiar with that opinion, but it's not appropriate to come up here and one minute into it talk about a case that you didn't give to the other side. So I'm going to give the other side an opportunity if they want to submit a 28-J on that case, they may. Yes, Your Honor. But go ahead and make your argument. I apologize. The situation in Melton, and I won't belabor this point for precisely the reason that you've mentioned, is a circumstance where even if the plaintiff's view of the facts had been believed, there was no basis for – the qualified immunity defense was appropriate because in that instance, the officer's participation in the swearing out of a warrant was insufficient as a matter of law to support liability under Section 1983. And more importantly, it gave a basis for his qualified immunity defense. Counsel, though, is the fact issue material? Because what difference does it make if he's really reaching for a screwdriver or shifting gears if we're looking from the perspective of what could a reasonable officer fear for his safety if he doesn't know what he's reaching for? That's the hard part of this case. I understand that. I have two responses to that question. The first is that throughout his briefing, Officer Trujillo does not simply rest his argument upon a belief that there may have been a weapon. He states affirmatively at a number of points in time, and by way of example, I would say, pages 9 and 10 and 26 of his brief, that it's not just that he feared that perhaps Mr. Rodriguez had a weapon. He states affirmatively that Mr. Rodriguez was holding an object and moving it towards him in the period of time between the door closing and the vehicle moving, which on the videotape is a total of 1.12 seconds. So Officer Trujillo's argument in that regard does not depend on some existential threat that there may have been a weapon or even the fact that Mr. Rodriguez's hands may have disappeared from his line of sight for a brief period of time. It depends, according to his brief, upon his affirmative belief that there was a weapon brandished and being moved towards him. And that is where the district court found the material question to lie because there is no way to tell from the videotape whether or not Mr. Rodriguez in fact moved across his body with a weapon towards the officer before the shots were fired. But even if he didn't have a weapon, he could still shoot him if he was afraid that he might or if he was mistaken as to the existence of the weapon, right? I'm not sure I would agree with that totally. I certainly understand that officers make split-second decisions in tense situations, and in those circumstances, mistakes of fact can, in some instances, not deprive the officer of qualified immunity. I mean, these are tragic incidents when they happen, but we have cases where the officers are mistaken, but in the scheme of things, they were allowed to be mistaken for qualified immunity. Well, and for that, on that issue in particular, I would say that this case is distinguishable from those cases, cases like Ontiveros, for example. It's distinguishable, I think, because in particular, Officer Trujillo never bothered to mention the possibility of a weapon, the possibility of a lunge at the scene. All he mentioned was that Mr. Rodriguez had reached for the center console. So you're saying the more the officer lies, the more it draws into question what really happened. I don't know that I would go quite that far, but I do think that there is a sound body of law, including the D.C. Circuit's decision in Fife, which has found some support in this circuit, that suggests that where the officer's testimony is riddled with some inconsistencies or implausibilities, that the court isn't obligated to credit that testimony as uncontroverted. And what's implausible about that? Implausible about his... Why is that a lie or implausible? You didn't say it was a lie, but why is that implausible? That he was reaching for something. Why is that implausible? I think a jury could conclude that it is, because I think the jury could conclude that Officer Trujillo's recounting of events is a self-serving effort to justify his actions after... But is there something we know that means it's false automatically, that we say that that's automatically false? That's what I'm not getting. But the premise of the question that was asked, can you help me here? How do we know that that's implausible as opposed to just wrong? That his story is implausible? Yes. I think what we know is that in the immediate aftermath of this event, he made absolutely no mention of a weapon. In the immediate aftermath of the event, he went into the vehicle and moved materials around and then later claimed that a screwdriver was... After he had visited with counsel and had six days to collect his thoughts, he claimed suddenly that a screwdriver had been wielded at him. And I don't know that it's implausible. A jury could assess that evidence, certainly, and conclude that Officer Trujillo's story is what it chooses to believe. And in that instance, I have to concede that if the jury makes that determination, he's entitled to qualified immunity almost certainly. But there doesn't have to be a screwdriver for him to get qualified immunity, right? Well, I think there has to be a reason to believe his story that there was some sort of... I'll step back. I do think that his assertion that this item was directed towards him affirmatively makes a difference in terms of how the court and the jury should assess the evidence. It's not enough... And I couldn't see his hands. And I know so many people have been shot on the side of the road in the dark like this when they're by themselves. It might be a different case. So if he didn't say I think he was reaching for something specific, then it would be a different case? I still think given the circumstances and particularly given the fact that the videotape in this case doesn't do much to fully corroborate Officer Trujillo's story... It doesn't corroborate anybody's story. It doesn't, but it leaves open I think the question of fact as to what happened in the vehicle. The material fact question is, as Judge Hainan noted, to what was Officer Trujillo responding? If it was simply a driver who was choosing to flee a stop, a misdemeanor stop, there's constitutionally no justification for the use of lethal force at that point. If it is instead to his perception that a weapon was being wielded toward him, then the constitutional question is very different. Are you relying on the fact that one of the shots, or maybe two of the shots, take place as he's starting to drive away? Or do you concede that it's all one fell swoop kind of thing? It's really quick. It occurs very quickly, but I would say this. The witnesses who have testified in depositions who've been shown the videotape have agreed that the shots were fired after the vehicle had begun to depart the scene and not as it remained in place. But you're not saying that one shot is before and one shot is after and he should have held one? You're not trying to distinguish between the shots? My understanding of the testimony of the various witnesses is that none of the shots came until the car had begun to depart the scene. And as the court has said and... Is it a stick shift? My understanding is that it is an automatic with a shifter. Oh, okay, because it's kind of slow. I mean, it's kind of jerky what's happening, and so it wasn't... Well, pardon me, I didn't mean to interrupt you. No, you go ahead. But my understanding of the scene, and I think in particular Judge Haynen's reconciliation of the tape, is that Mr. Rodriguez put the car into neutral, revved the engine, and then put the car into drive. All of this, of course, happens in a span of 1.12 seconds from the time he closes the door until the car departs. But the videotape, while not corroborating either side's story of the actual transaction between Officer Trujillo and Mr. Rodriguez in the vehicle, does corroborate the fact that the engine revved, then the vehicle was put into gear and departed. Well, the revving could be... That doesn't cut in your favor, does it? That's more time at the scene where the guy could shoot him. Well, I don't think it changes the amount of time at the scene. Is that still part of the 1.1 seconds? It's still part of the 1.1 seconds. But, I mean, he's not just taking off. He's sitting there for... I mean, he's revving the engine, and he's closed the door. It's pretty quick, though. It's a very brief rev. It's as if, and I think, again, this is what corroborates our version of the facts, it's as if he failed to get the vehicle into drive when it landed in neutral, and he pushed the gas pedal. The engine would necessarily rev in response to that. He realized he wasn't going anywhere, and he put the vehicle into drive. Of course, a significant problem here is that we only have one person who was a participant in the transaction available to testify about what occurred. And I think, as I noted, the D.C. Circuit in Flife, and I think virtually every other circuit, including this one, has recognized that where there are inconsistencies, where a videotape may, in the sense that I've just noted, corroborate or cast doubt upon the story told by the police officer, it may not be... How does it cast doubt? That's the part. I don't know how the videotape casts doubt on the police officer's statement. Well, I would say two different things. First, it doesn't corroborate the police officer's statement. Nothing. It doesn't corroborate either side. It's neutral. It doesn't show what happened in the car. Yes. I agree it doesn't show what happened in the vehicle, but it does show that Mr. Rodriguez was manipulating the gearshift. Well, we don't know that he's manipulating the gearshift. The vehicle is in park when the stop begins. It ends up in drive, so the gearshift had to have been manipulated.  Yes, Your Honor. Okay. But is this some point still within this 1.12? Yes, Your Honor. Okay. And it also shows that the shots occur after he's already moving. My understanding is that the witnesses testified that that is true. But it does not actually show that on the video. You can't really, if you try to time it with the stopwatch or something, which the public courts should not, we shouldn't be in the business of trying to go behind, although Scott B. Harris says that if it gets clear, we can. I would agree with that, and I would say that's exactly the reason that Judge Hayden did what he did in denying the motion for summary judgment. He recognized that a jury could look at that videotape and make these assessments in a way that would not require the appellate court to do that. Okay. So the other gentleman, there's no one there to corroborate. It's just to poke holes on whether the officer really thought he was grabbing for something, right? I think that is the material question. If that's material, does the officer actually have to think he's grabbing for something? Or does the officer just have to be in fear that he might be? Well, the officer can't just walk up there and shoot him because it's dark. No, but if he thinks he might be grabbing and he can't see his hands. That's why the police are always saying, show me your hands, show me your hands, show me your hands. It's like if you do any of these constant requests to see your hands. I would say here, though, that the videotape doesn't show that any requests like that. There were no requests, but he did say, what were you doing back there, man? Or something like that. And the guy says, I'm not involved. He says in Spanish or something. I mean, that's not relevant what language he's in, but that's all that happens. We don't have that dialogue. That account of the event is. Is that in dispute? I don't know that it's in serious dispute. Although I would say that it is significant that there is no recording of the officer ordering Mr. Rodriguez out of the vehicle. Or asking Mr. Rodriguez to show his hands or anything like that. I mean, it may very well be prudent for. But we do have him saying, what happened back there, man? It's the beginning of that conversation. Yeah, we have that recording. But the rest of the encounter is, there's no audio of that. And we have the gentleman. Do you not agree that we also have the gentleman saying, I'm not involved, so to speak? I believe that's correct. That he's saying, no, you know, it's not me. Yes, I know to what you're referring. I believe that's correct. I don't recall off the top of my head, and I apologize, whether that is simply Officer Trujillo's account of their conversation. No, but it's something you can hear on the tape. I'm sorry, I don't recall. Okay. So what's your best case that this fact issue is material? My best case that the fact issue is material is, I think it's Lytle. And I guess, I don't mean to suggest it's a degree of generality, but Graham makes a huge difference here. Because Graham says, in essence, that if he's fleeing and not brandishing a weapon, the use of lethal force is not constitutionally permissible. On the other hand, if he is brandishing a weapon, if he's threatened the officer, Graham says that the use of lethal force becomes acceptable. And so I suppose, in that sense, that is the material question, is which side of Graham does this encounter fall? I would urge, again, that I think this case is paradigmatically the sort of case that the court has generally not accepted jurisdiction in and has not reviewed factually. Can you give us a case on that, please? If it's a paradigm, then it would be good if you had a... I might be exaggerating my position on that, Your Honor. It would really be helpful if you had a case. Off the top of my head, I'm not specifically recalling one. I would imagine that... I'm trying to specifically recall that point in our brief, and I don't. I'm sorry. That's okay. I would stand on whatever my brief says on that issue with respect to... That was a nice touch. I'm sorry? She just said that was a good idea. Anything else? I don't think I have anything else, Your Honor. I would just say that there are fact questions here about the objective reasonableness of Officer Trujillo's conduct. And I'd like to add that a case like Onoveros, for example, is not... It is a case in which the court recognized that... We wouldn't rely on Onoveros for the idea that there's a conflict in the evidence, because in that case, the court took the best side of the story for the plaintiffs, and it recognized that there were facts in the plaintiff's view of the case that actually supported the officer's view of the story, and there was nothing else in the record to controvert the officer's view of the event. I'm just thinking about this case that we had where it's an officer and a lone gentleman, and he gets out of the car and he starts running, and there's an issue between whether he's running away or whether he's running towards the officer. And the plaintiff's side says that he's running away, but he has to run kind of at an angle, and the defense side is saying that he's running towards the officer. We didn't find there was a fact issue. We said the reasonable officer could perceive that he was running towards him, even though his witness representative maintained that he was running away, and we had a video of it. Do you see what I'm saying? I don't know how that case is different than this case. I wish I knew the case specifically. I mean, that one he was running towards a different officer. No, there was no other officer. No, in this particular one I'm talking about that I was on the panel. That's fair. I'm thinking of one where there was an officer. It's not fair to you to be asking a case we're not even naming. I'm sorry. And I apologize. I should have a better knowledge of your case law than that. It's just hard. This is a hard area. I agree with that completely, and I would just note, I'm shy to bring a policy argument of any sort, and I'm certainly not the person to stand here and suggest that qualified immunity has lost its way and needs to be rethought by this panel. But there is a lot of scholarship and a lot of judicial worrying, I suppose, about where qualified immunity stands and how it's wavering between moving closer and closer to being an absolute immunity. In every case, under every circumstance. And the court is well aware of that scholarship and follows it closely, but we have to follow the existing law as it is right now. I absolutely agree. And I think, again, what Judge Haynen did was look at the evidence, decide that there were two different sides to this story, that the video didn't break the tie, and based on that decided to let the jury resolve that issue. And with that, I thank you for your time. Thank you very much, counsel. Your Honors, following up on what opposing counsel just stated, how Judge Haynen viewed, I want to take a moment just to address the standard of review, the legal standard of how the facts should be viewed versus as compared to how Judge Haynen viewed them. And it's true, yes, the court must accept the plaintiff's version of the facts, but only to the extent supportable by the record. And here there's nothing on the record, one, that would support plaintiff's version. What about this issue of whether the witness is saying the shots were fired after he starts fleeing? Doesn't that support the plaintiff's version? I don't know what testimony he's referring to on the record. I don't recall any of that on the record stating that there was witnesses stating that the shots were fired after the vehicle was moving. I recall during depositions the video was shown to each witness. And, I mean, as we've discussed already here, it's very fast and instantaneous. If it's not at the moment the vehicle is moving, it's immediately thereafter. So there's nothing on the record. He keeps shooting. Excuse me? He keeps shooting. It's not just one shot. Correct. There was four shots, Your Honor. And that's a lot of shots when the guy's fleeing. And he's a fleeing misdemeanor, not a fleeing murderer or whatever where there's a reason. Not like Mullinex where he's threatened and claims to have a gun, et cetera, et cetera. He's just fleeing, having stolen some beer. And he keeps shooting. Isn't that enough to at least say, look, there's some fact questions here. Maybe we ought to let the thing run its course. I don't think so, Your Honor. I believe that the video shows that everything happened so fast and it was so immediate. And I apologize if I was mispronouncing little. It's little in the case law. But it even states in that case that Judge Hainan referred to that if the shots are fired immediately thereafter, it's still within the constitutional bounds. And in addressing Apolli's argument that we cannot take or their assertion that we should not take, that the court should not take the officer's account of what happened, the cases that they cited in the Fifth Circuit, I believe it's State of Texas versus Kleiner, that wasn't even a case involving qualified immunity. But does it matter that the officer's story changes? I mean, I understand we've got two people that really are witnesses. One of them is dead. So the guy that's the defendant in this case, he's the only storyteller who was there. So, but that's okay, that doesn't prevent qualified immunity, except he's kind of expanding, enlarging, on-changing, somewhat modifying, and not completely consistent with, though not contradicted by, the video. Does that make a difference on this whole analysis of whether we have jurisdiction over this interlocutory appeal? No, and I think you hit it right there when you said there was nothing contradicting in any of his statements. Yes, he went into more detail when he was interviewed by the Texas Rangers and gave his full statement. But when you're judging him at the scene, immediately after an event where, a tragic event, I don't think anyone can expect someone to be in full detail as if they were sitting in front of. But that seems like the sort of detail, just like I would have expected the shopkeeper, if he was held at a gun to get the beer, to say that, instead of just saying this guy took some beer without paying for it. I mean, it's the sort of thing you say. He was reaching for a weapon. I had no choice. I mean, that's like the first thing you would say. Or at least a reasonable jury could so conclude. I believe, Your Honor, he stated that he was reaching for the console. It wasn't as detailed as his statement. But even then, the cases that have been cited by the appellees that try to, where they're trying to assert that the officer's account shouldn't be taken for, you know, the version shouldn't be taken, they all are involving cases where there was contradicting testimony, either by independent witnesses, other officers, or even physical evidence. But do we discount the witnesses who watch the video and say the shots are clearly after the car starts moving? That seems to be your implication from the earlier change we had. I just want to be clear on that. Well, one, I don't, I'm not accurate. I'm not for sure that that's what the witnesses say, for one. Even if they did say that I was in those depositions, the video was shown to them, and it was based off on questions where the video was shown. So their answer to that, it would have been moving. But as, I don't think it, I mean, we're losing the sight of what the officer's perception was and the decision that he made at that moment to shoot. It can't cease. If it happens immediately, and I know I'm out of time, if I could just finish this up. If it happens immediately after he perceives that threat, this court has held that it's still within the constitutional bounds. Thank you, counsel. We have your argument. We have both arguments. This case is submitted. This concludes the arguments for today. Thank you very much.